## CONGREGATIONAL CHURCH AT MOBILE v. ELIZABETH MORRIS.

1. The true construction of the two acts of the Legislature for the relief of Elizabeth Morris, is, that she was made capable of inheriting the lands of her uncle, James D. Wilson, in the same manner as if herself, her mother and her uncle, had been native born citizens. The declaration in the act, that the land shall not escheat to the State, is a waiver of the right of the State in her favor only, and will not enable her brother, who is an alien, or was so at his uncle's death, to inherit as his heir.

2. When a certified copy of a registered deed is admissible in evidence, it is *prima facie* a correct copy of the original, but may be shown to be incorrect, by comparing it, either with the original deed, or the record of it on the Register's book. But where the difference between the record of the deed, and the copy taken from it, consisted in a scroll, or written seal, which was found in the copy, and did not appear upon the Record book, when produced in Court, it was not error for the Court to leave it to the jury, to say, whether the copy was not correct when it was taken, as the

original deed was in Court, in the possession of the other party, which he declined to produce.

3. The wife of an *alien*, though an American citizen, is not dowable of his lands.

4. Whether the saving in favor of creditors in the statute of escheats, applies to the land held by an alien at his death—*Quere?* But if it does apply in such a case, the fact of such indebtedness would not prevent the escheat. Nor could the land be sold by an administrator of the alien, for the payment of creditors, without authority from the Orphans' Conrt, as in other cases.

Error to the Circuit Court of Mobile.

EJECTMENT by the defendant in error, for a lot in Mobile. Upon the trial, as shown by a bill of exceptions, it appears, that the plaintiff, to prove title to the premises, read in evidence a statute passed 9th January, 1836, entitled "an act for the relief of Elizabeth Morris," and proved that James D. Wilson was her uncle; that her mother was the sister of said James; that herself, her mother, her father, and said James, were all natives of Scotland, and not naturalized. That Wilson purchased a piece of land, of which the lot sued for was a part, of William E. Kennedy, and received from him a conveyance, dated in 1818, under which he held the possession, and that he continued in possession until he died, in the year ——, intestate, and without children.

That the plaintiff came to this country with her mother, between the years 1820 and 1821, and has since resided here; that her mother died in 1822; that her father never came here, and died in Scotland; that her three brothers, David, Charles and George, also came to this country, but that George alone is living. It also appeared, that Wilson had a brother in Scotland, but it was not known whether he was living or not.

The plaintiff further gave in evidence, a duly certified copy of the conveyance of Kennedy to Wilson, purporting to be a copy of the registration of the instrument, in the clerk's office, (having laid the grounds for the introduction of secondary evidence,) and by the copy so offered and certified, there appeared a seal, or scroll, affixed to the name of William E. Kennedy, so as to make it a deed, or sealed instrument. It was further shown, that Kennedy was in possession before the sale to Wilson, and that he

claimed under a concession by the Spanish Government, made to Thomas Price.

The defendant proved, that on the 9th August, 1836, it purchased the lot from one Johnson, for $———, and received from him a deed of conveyance of that date; that he was in possession of the property at, and before that time; that they gave a full value for the lot, and expended on it $13,000.

The defendant further proved, that Wilson married in this country, a native American wife; that when he died she remained in possession of the property, and continued in possession until she sold it. That she was appointed administratrix of the estate of Wilson, and paid a portion of his debts. That among other debts, was one to James H. Garrow, who transferred it to Bartlett & Waring. That the widow married one Lord, by whom she had a son, who is still living. That Lord died, and she married one Morgan Brown, who is still living, but that she is dead. That Wilson left no personal estate of any value, and that on the 12th March, 1835, Brown and wife, for $6,050, conveyed the premises to Bartlett & Waring, and put them in possession.

The defendants, to show, that the conveyance from Kennedy to Wilson, was not a sealed instrument, but a simple contract, introduced the original book of records, kept in the County Court, from which the copy shewn by the plaintiff purported to have been taken, and in which original record, there appeared no seal or scroll to the name of Kennedy, and in this respect the record book differed from the copy; but it was in proof that the original deed was in Court, in the possession of the defendant's counsel, who refused to introduce the same.

They further read to the jury, a Spanish concession made to Thomas Price, in 1806, and a conveyance thereof from Price to William E. Kennedy, previous to the deed from him to Wilson; also, a deed from William E. to Joshua Kennedy, in 1824, and also a patent from the United States to Joshua Kennedy, upon the confirmation of the grant, dated April, 1836, which embraced the land sued for. Joshua Kennedy died, and left children as his heirs, in 1838.

Upon the above state of facts, the defendant moved the Court to charge, that the plaintiff could not recover, by reason of any descent cast from her uncle; also, that she could not recover the whole title, as she had brothers. That she could not take as a

grantee of the State, as for lands escheated to the State. That the wife of Wilson would be entitled to dower in the land, and that the title made by her to Bartlett & Waring was superior to that of the plaintiffs.

These charges the Court refused, and charged, that the effect of the two acts of the Legislature, was to vest in the plaintiff a good title by descent, as sole heiress of James Wilson, if she was his niece, and he died intestate and without children, notwithstanding she had brothers and another uncle, all being aliens. That the act enabled her to take alone, the whole estate. That the wife of Wilson being a native American, made no difference, her husband being an alien, she was not entitled to dower; and that the plaintiff could take without office found of the escheat of the lands.

The defendant further asked the Court to charge, that unless Wilson had the legal estate, or fee simple to the property, there could be no escheat, and if the conveyance of W. E. Kennedy was not a sealed instrument, or deed, the legal title did not pass to Wilson by it. That if the fee was in the United States, till after Wilson died, there could be no escheat. That the original record of the deed of William E. Kennedy, no seal thereto appearing, was conclusive against the evidence of the copy that there was no seal. These charges the Court refused to give, except the first, and charged the jury, that there could be no escheat unless Wilson had the legal title, but that the patent was only a confirmation by the United States of the Spanish title, and did not operate as a new grant of the land, to prevent an escheat. That it was for the jury to determine, whether the deed of Kennedy was sealed or not, from the copy and the original record; that both were before them; that the record was not conclusive, and they might infer, if they thought proper, that the clerk had done his duty in making the copy, and that when it was made, there was a seal, although none now appears. To all which the defendants excepted.

The assignments of error embrace all the matters presented by the bill of exceptions.

CAMPBELL and STEWART, for plaintiff in error made the following points:

The title of the plaintiff derived from the two acts of Assem-

24

bly, must either operate as a grant, or in removing a disability. The latter only was intended ; the statute does not grant the title, but confers on her the privilege of taking by descent, notwithstanding her alienage.

It is one of the first principles of the law of descent, that it must vest at the time of the descent, or it cannot vest at all ; but Wilson died in 1824, and her capacity to take by descent did not exist until long afterwards. [2 Hill, 67.] Nor can this capacity be conferred by the Legislature, as it cannot create a fact. See also, 2 Howard, 589; 8 Wheaton, 1.

The estate derived through the widow, having vested, could not be thus divested. It might grant the land to her, if it had the power. Has it done so ? That point was decided when the case was here before, under the first statute, 9 Porter, 270 ; the last act has merely removed another disability.

The State had not the power to grant. The act itself declares that the land shall not escheat—and the plaintiff, by the act, is to take as if Wilson, herself, and her mother, were citizens.

The land, in point of fact, did not escheat. At the time of the death of Wilson, the title was incomplete, and the warranty of Kennedy did not pass to the State, with the land. [Shep. Touch. 200 ; Lincoln College case, 3 Rep. last page of the case.] When, therefore, Kennedy received the title from the United States, he took it discharged from the obligation of his warranty. Whether the property would revert to Kennedy, or belong to the first occupant, it is clear it could not escheat to the State. [3 P. Will. 32, note; 16 Vin. title Occupant ; 3 Vesey, 423 ; 1 Coke's Ist. 228 ; Cruise Dig. Escheat; 3 Vol. 286, 296 ; 1 Hilliard's Ab. 23.]

At all events, the Court erred in saying that Miss Morris was entitled to recover the entire lot. The statute gives the widow one half, when there are no children. [Clay's Dig.] The wife being a citizen, may take dower from an alien husband. [Cruise Dig. 3 vol., 303 ; 9 Mass. 363.] An alien may sell, and convey, or devise, [7 Cranch, 621,] and, as marriage is a purchase, he may endow.

The Court erred in leaving it to the jury, to say, whether the original record, or the false copy, should be believed by them. They also cited, 5 Rawle, 112 ; 1 Lomax Dig. 604 ; 3 Pick. 221 ; 1 N. & McC. 292 ; 7 Com. Dig. 79 ; 1 id. 553; 4 Cranch, 321 ;

1 Hay. 373; 11 Wheaton, 332; 1 Bro. 201; 1 Blk. R. 123; 1 Eden. 177; 3 B. Monroe, 252; 2 How. 589; 2 Peters, 434.

PHILLIPS, contra.

The title of the defendant in error is under the acts of 1836 and 1841, which show, that in her favor the State releases its escheat—it declares, that she shall " take and hold," &c.

As the property of Wilson vested in the State, immediately on his death, as declared by the statute, these acts must be construed as a donation to her; for it cannot be considered that the State yet holds this interest, in opposition to its own acts. At common law, as well as by our statute, the property vested immediately in the State, without office found. [Clay's Dig. 189; 15 Pick. 345; 16 id. 177.]

There is no incumbrance upon the property—for the widow is not dowable, of the lands of an alien husband. [1 Coke Litt. 30 b, 31 a.]

A grant by the State to individuals, to hold lands in a corporate capacity, itself confers the corporate character. [2 Wend. 109; 3 Pick. 224.]

If a mere equitable right of escheat existed, the State would take as the successor of Wilson, and take a complete title, as Wilson would have taken, had he not labored under the disability of alienage.

The certified copy of the deed, under the circumstances of this case, is conclusive. He also cited, 3 Hill, 79; 2 Leigh, 109; 1 Johns. Cas. 400; 2 Term, 696; 7 id. 2; 3 Phil. Ev. 369; 1 Ala. Rep. 273; 4 id. 86.

ORMOND, J.—The principal question in the cause, depends upon the proper construction of the two acts of the Legislature, passed for the relief of the defendant in error. The act of 1836, is to the following effect: " Be it enacted, &c. That Elizabeth Morris, an alien, of Mobile county, be, and she is hereby, authorized to inherit, and have and hold, such of the estate of her late uncle, James D. Wilson, as she might have inherited by law, if she had not been an alien, and that the same shall not escheat to the State."

The construction put upon this act, in the case of Bartlett & Waring v. Morris, 9 Porter, 269, was, that it merely removed the

disability of *alienage* existing in Elizabeth Morris, but did not qualify either her mother or Wilson, her uncle, if *aliens*, to transmit to her an inheritable estate. In effect, that it merely gave to her the benefit of citizenship. To remedy the omissions of this act, the act of 1841 was passed:

"An act to amend and explain an act entitled an act for the relief of Elizabeth Morris.

"Be it enacted, &c. That Elizabeth Morris, an alien of Mobile county, be and she is hereby authorized, and enabled, to have and to hold, such of the estates of her late uncle, James D. Wilson, who died in Mobile county, as she might have inherited by law, had she not been an *alien*—had her mother, who was the sister of said Wilson, not been an *alien*—and had the said James D. Wilson not been an *alien*, but a citizen, capable of transmitting inheritable estates. And that the true intent and meaning of the act, of which this is amendatory, is, that said Elizabeth Morris should have been made capable of inheriting from her said uncle, in the same manner as if the said Elizabeth, her mother, and her said uncle had been natural born citizens of the United States."

Nothing can well be conceived more explicit than this last act, to remove the obstacles which opposed the assertion, by the defendant in error, of title to the land, as the heir at law of her uncle. The defect, as we have seen, of the former law, was, that whilst she was made capable of taking, her mother, and her uncle, being *aliens*, were incapable of transmitting the estate. The effect of the act, is, to give to all these persons the attributes of citizens, and the only question upon this part of the case, is, whether she has shown herself to be the sole heir of her uncle.

The uncle, it appears, died without children, and it does not appear that he has any brother or sister alive; his nephews and nieces are therefore his heirs at law. Of these, it seems, there are but two living, the defendant in error and her brother George. It does not appear that the latter was a citizen at the time of his uncle's death; but if he were, his mother and uncle being aliens, could not transmit to him inheritable blood, and it is therefore the same as if he were not in existence. [Orr v. Hodgson, 4 Wheat. 401; Smith v. Zaner, 4 Ala. Rep. 106.] The act of 1841 removes the disability arising from the alienage of the mother, and uncle, *sub modo*. It would be a most unreasonable interpretation

of the act, so to construe it, as to remove the disability as to all the relations of Wilson. The act is for the relief of Elizabeth Morris,. and authorizes *her* "to have and to hold" the estates of her uncle, and to have her right to inherit through her mother, in the same manner as if all the parties had been native born citizens.. The act, in a word, makes *her* capable of inheriting her uncle's estates, and to accomplish this object, it removes out of the way the impediments arising from the *alienage* of her mother and uncle; as to all the rest of the world they continue to be, what they died, *aliens*. This is the plain and obvious intent of the statute; any other construction, would defeat the object the Legislature have, by two several acts, endeavored to accomplish. We think therefore, that she is shown upon the record to be the sole heir of her uncle, capable of inheriting his estate.

It is further urged, that the power to inherit must exist at the time of the descent cast, and that as no such capacity existed in the plaintiff, at the death of her uncle, it cannot be conferred by the Legislature, which it is said cannot create a fact.

It was certainly competent for the Legislature, to waive the forfeiture arising from the alienage of the plaintiff's uncle, and it is wholly unimportant, in the present case, that this is done by an act having a retrospective operation. The power of the Legislature to pass acts of that description, affecting civil rights, cannot be questioned, and has been repeatedly recognized by this Court. The prohibition of the constitution of the United States against the passage, by the States, of *ex post facto* laws, relates to penal and criminal proceedings. [Watson and others v. Mercer, 8 Peters, 88.] Whether the States can pass retrospective laws, affecting vested rights, is a question not presented on the record, as no right is shown to have existed, but the right of the the State by escheat.

The case of the People v. Conklin, 2 Hill, 67, is unlike this case, in the important particular, that there the State was enforcing its right of escheat, against the descendant of an alien; and the Court held, that the naturalization of the alien, many years after the descent cast, would not retroact, so as to divest a right which had previously vested in the State. It is obvious that has no application to a case, where the State is not only not enforcing its rights, but has, in the most explicit terms, declared that the land shall not escheat.

It is further urged, that at the time of the death of Wilson, the title was incomplete, being then either in Kennedy, from whom he purchased, or in the United States, and that the warranty of Kennedy to Wilson, did not pass with the land. It is stated in Sheppherd's Touchstone, 200, that "he that comes into the land, merely by the act of law, in the post, as the Lord by escheat, and the like, shall never take advantage of a warranty." It is not necessary that we should enter upon the inquiry, whether the statute of this State, in relation to escheats, has not swept away entirely, the ancient common law doctrine of escheats, with its feudal appendages, by making the State, the successor to all persons who are intestate, without heirs, whether the property be real or personal; because, from the record, it appears that the fact is not as the argument supposes.

To establish a legal title in Wilson, at the time of his death, the plaintiff offered in evidence a duly certified copy, from the records of Mobile County Court, of the conveyance of the land from Kennedy to Wilson, by which it appeared, that it was a sealed instrument. The defendant, to prove that it was not a deed, produced the original record book, from which the copy offered in evidence was taken, and from that it appeared, that there was no seal or scroll attached to the name of William E. Kennedy, the grantor. The original deed was also in Court, in the possession of the defendant's counsel, but which he declined to produce in evidence. The Court left it to the jury to determine, as a question of fact, whether the instrument was sealed or not, and refused to instruct them, that the appearance of the instrument in the record book was conclusive, that the original was not a deed.

The object of our registration acts is two fold; to give notice of the existence of the instrument recorded, and as far as practicable, to perpetuate its contents; and if the deed be lost or destroyed, or not in the power of the party to produce, the statute makes a certified copy from the record, evidence. [Clay's Dig. 155, § 25.] We apprehend, however, that the certified copy, thus produced, is only *prima facie* evidence of the contents of the original, and may be shown to be incorrect, as the record itself is but a copy from the original.

The transcript offered in evidence in this case, might doubtless be confronted with the record, of which it purports to be the

transcript, and if it differed from it, must yield to it, as the record is the original of the transcript. If the difference consisted in the omission of part of the written contents of the recorded deed, or in an alteration of its terms, and the record bore no marks of violence or change, there would be no room for doubt; but the want of a scroll, or flourish of the pen, against the name of the grantor, does not appear to be of the same conclusive character

It must be recollected, that it is not shown by proof that there was a mistake in the copy, at the time it was taken; but such mistake is sought to be inferred, because, at the time of the trial of the cause, it did not appear by inspection of the record, that there was a scroll appended to the name of Kennedy, the grantor. Now, it may be that the scroll had once been there, and effaced by mechanical, or obliterated by chemical means; or it may have been made so faintly, originally, as to have disappeared by efflux of time. It must, however, be conceded that in the absence of any proof throwing suspicion over the purity of the record, it would be the duty of the jury to give effect to the record, against the transcript, where there was a variance between them. But, there is another fact in the cause which presses most strongly upon us, as it doubtless did upon the jury in attaining their conclusion; it is, that the original deed was in Court, in the possession of the defendant, who therefore had it in its power to remove all doubt from the question, by the production of the original, and declined doing so. From this conduct, a strong presumption arises that the production of the paper would have established the fact, that it was a deed, as otherwise it would clearly have been its interest to produce it, and not to rely upon the weaker, and contested evidence, afforded by the record, which, though legal testimony, was inferior to the original deed.

Mr. Starkie lays down this rule in these words: " Although a party may not be compellable to produce evidence against himself, yet if it be proved that he is in possession of a deed or other evidence, which, if produced, would decide a disputed point, his omission to produce it, would warrant a strong presumption to his disadvantage." [1 vol. 489.]

So in Haldane v. Harvey, 4 Burr. 2484, the law is thus laid down, and was the basis of the judgment of the Court in that case. It is indeed, but a modification of the rule, that the party must produce the best evidence in his power.

As, therefore, the Court instructed the jury that the plaintiff could not recover, unless Wilson had a fee simple title, the finding of the jury in favor of the plaintiff, is an affirmance of the existence of such a title, at the time of his death, and there can be no doubt that this was such an interest as would pass to the State, Wilson having died intestate, and being an alien, incapable of having heirs. The language of the act is—"The estate both, real and personal, of persons within this State, who have died intestate, or who may hereafter die intestate, leaving no lawful heir or heirs, shall be considered as escheated to the State of Alabama." [Clay's Dig. 189, § 1.] This interest, or right of succession, by the act in favor of Miss Morris, the State waived, and removed all the disabilities which prevented her from asserting title to the land as the heir of the deceased.

It is further insisted, that the plaintiff is not entitled to recover the entire lot, as Wilson left an American born wife, who entered upon the land in virtue of her right of dower, and afterwards sold and conveyed it to another. A widow has no estate in the lands of her late husband, until her dower is assigned, but a mere right to occupy the dwelling house, &c. until her dower is allotted. [Weaver & Gaines v. Crenshaw, 6 Ala. Rep. 873.] And it does not appear that any assignment of dower was made in this instance. Again, an estate in dower, is an estate for the life of the dowress only, and if it had been assigned to her, would have terminated at her death, which occurred before the suit was brought. It is equally clear, that she could convey no greater interest than she had herself.

Independent of these considerations, the widow was not entitled to dower. An alien may, it is true, purchase land, but he holds for the State; in contemplation of law, he has no interest in it, and therefore cannot transmit any. Nor can any one, by operation of law, derive an interest by, or through him. It follows, that the wife of an *alien*, though she be a citizen, is not dowable of his lands, and such is the settled rule of law. [1 Thomas' Coke, 662, 31, a; Park on Dower, 229.] The sale and conveyance by her passed nothing, and interposes no obstacle to a recovery.

The question as to the right of creditors to have their debts discharged out of the escheated lands, is not distinctly presented upon the record. In the case of escheats at common law, there

can be but little doubt that the crown would take the land, free from the payment of the debts of the deceased; to the payment of which it was not in any case directly subject. In practice, however, it appears the right of the crown is not asserted even against the natural relations of the deceased. See Hubbach on Succession, 74; and several acts of Parliament have been passed on the subject.

The statute of escheats of this State, contains a provision, "that nothing herein contained shall prejudice the right of creditors, or other individuals having claims or legal titles, or who shall be under the disabilities of infancy, coverture, duress, lunacy, or beyond the limits of the United States, untill three years after the disability shall be removed." [Clay's Dig. 191, § 9.] Whether this clause applies to lands of aliens which have escheated, or not, it is not proper we should now discuss. It is true, it appears that a portion of the debts of Wilson are still unpaid— that one of those debts belonged to Bartlett & Waring, who became the purchasers of the lot from the widow of Wilson, and her husband, after her second intermarriage for $6,050. But what the amount of the debt is, is not shown, nor indeed is it shown that the defendant derives title through Bartlett & Waring.

If it were conceded, that the creditors of an *alien*, were entitled under the statute, after his personal estate was exhausted, to the payment of their debts out of his lands escheated to the State, it is apprehended the fact of such indebtedness would not prevent the escheat, but would be a charge upon the land to which the State had succeeded; and that the land could not be sold by an administrator of the *alien* for the payment of the debt, without authority from the Orphans' Court, as in other cases.

If, then, it be true, that these debts are a charge upon the land, and are not barred by the limitation of the statute, it would not prevent a recovery by the plaintiff, who, whether she is considered as succeeding to the rights of the State, or by the removal of the disabilities of alienage, is enabled to deduce her title as heir at law of her uncle, would, in either event, be entitled to recover the land, though there might be outstanding debts which were a charge upon the land.

From these views, it results that there is no error in the judgment of the Court below, and it is therefore affirmed.